IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

KENNETH YATES and RICHMOND MAY )
DAY COALITION/ORGANIZING )
COMMITTEE, )
)
       Plaintiffs, )
)
v. ) Civil Action No. 3:11CV258–HEH
)
BRYAN NORWOOD, in his official capacity )
as Chief, City of Richmond Police )
Department, *et al.*, )
)
       Defendants. )

## MEMORANDUM OPINION
**(Petition for Preliminary Injunction)**

This is an action under 42 U.S.C. § 1983 seeking injunctive and declaratory relief. Plaintiffs urge this Court to declare that "defendant's [sic] practice of requiring some parade permit applicants to pay for off-duty police violates plaintiffs' rights under the First Amendment to the United States Constitution and City Code §§ 102-500, *et seq.*" (Verified Compl. 7, ECF No. 1.) Plaintiffs further maintain that the requirement that some applicants compensate off-duty police officers to control traffic and provide security during parades is an unconstitutionally overbroad delegation of authority unguided by defined criteria for guidelines.

This case is presently before the Court on Plaintiffs' Petition for Preliminary Injunction. Both parties have submitted memoranda supporting their respective positions and the Court authorized limited discovery. The Court heard oral argument and received

evidence on April 26, 2011. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

The individual plaintiff in this case, Kenneth Yates ("Yates"), is a member of the Richmond May Day Coalition/Organizing Committee ("the Coalition" or collectively with Yates, "Plaintiffs"). The Coalition is "a loosely organized coalition of various Richmond-area groups whose purpose is to hold a march of a political, non-commercial nature celebrating workers and their families on May 1 in Richmond, Virginia." (Verified Compl. ¶¶ 4, 5.) Defendants are officials of the Richmond City Police Department ("the Police Department") responsible for reviewing and processing applications for parade permits. Bryan Norwood is the Chief of the Richmond City Police Department. Major Michael J. Shamus[1] and Sergeant Ward are members of the Special Events Division of the Richmond City Police Department, which is responsible for the issuance of parade permits. Chief Norwood, Major Shamus, and Sergeant Ward (collectively "Defendants") are sued in their official capacities.

Most of the material facts do not appear to be in dispute. On March 21, 2011, the Coalition, through Yates, filed an application with the Police Department for a permit to conduct a demonstration on May 1, 2011. The pre-printed form used to make application, entitled "Parade/Public Assembly Application" ("the Application"), was supplied by the Police Department. On the Application, Yates described the event as a public assembly and demonstration. The Application indicated that the event would begin at 3:00 p.m. and conclude at 8:00 p.m. Yates estimated that over 200

---

[1] Major Shamus, who was recently promoted, was sued in his official capacity as Captain.

2

demonstrators would participate. The Application also reflected that it would include marching bands, street puppets, signs, banners, flags, a bull horn, and a small public address system. The parade route was described as beginning in Monroe Park, proceeding west on Main Street, north on Lombardy Street, east on Broad Street, south on Laurel Street, and concluding in Monroe Park. Yates also indicated on the Application that no traffic control or police escort would be needed. The Application form contained the following admonition: "If police assistance is necessary and you need to hire Off-Duty Officers, you will need to contact the Off-Duty Coordinator for the Police Department at (804) 646-0445." (Defs.' Mem. L. Opp'n Mot. Prelim. Inj. Ex. A, at 2, ECF No. 15-1.)

According to Plaintiffs' Verified Complaint, Yates received no response from the Police Department until April 11, 2011, when he received a phone message from an officer informing him that his permit was denied. Yates maintains that he returned the phone call to the responding officer and learned that his permit would not be granted unless Plaintiffs agreed to pay for off-duty police escorts. The officer further advised Yates that the minimum cost of utilizing off-duty officers would be $294.00. The officer explained that this would include compensation for two officers at $28.00 per hour per officer for a minimum of four hours, and two police vehicles at $35.00 per vehicle. Yates represented in Plaintiffs' Verified Complaint that the Coalition is unable to pay for off-duty officers and vehicles.

Plaintiffs also allege in their Verified Complaint that on April 13, 2011, their attorney e-mailed a letter to Major Shamus and Sergeant Ward, with a copy to the general

3

counsel for the Police Department, advising them that "their requirement that plaintiffs pay for off-duty police was not authorized by Richmond's parade ordinance and was unconstitutional in the absence of guidelines constraining the discretion of the police." (Verified Compl. ¶17.) Yates contends that his counsel did not receive a response.[2] Aside from this e-mail, Plaintiffs made no attempt to arrange an alternative route or location for the demonstration, as authorized by § 102-505 of the City ordinance.[3]

Plaintiffs' argument centers on two aspects of the parade ordinance at issue. First, they contend that the Police Department has a practice of selectively waiving the requirement of paying for off-duty police officers as a condition for issuing a permit. Secondly, Plaintiffs maintain that the operative code provision, § 102-500 *et seq.*, neither authorizes the Police Department to require payment for off-duty police assistance, nor provides specifically-defined guidelines as to which applicants are required to make such payments or the amount they are required to pay. Plaintiffs argue that this lack of precise and definite standards vests unbridled discretion in the Police Department and violates the First Amendment to the United States Constitution on its face and as applied.[4]

Defendants do not appear to contest the Coalition's entitlement to conduct its demonstration and publically espouse its views. Rather, Defendants' opposition focuses on Plaintiffs' demand that the cost of police assistance be borne by the taxpayers as

---

[2] Yates represents in his Verified Complaint that in 2010, after a similar dispute over payment for off-duty police assistance, the Police Department granted Plaintiffs' permit without the requirement of compensating off-duty police officers. (Verified Compl. ¶18.) Major Shamus testified that the decision to waive such compensation was made by the Mayor's Office not the Police Department. No such request was made in the present case.

[3] Richmond City Code § 102-500 *et seq.* is attached to this opinion.

[4] Although the ordinance provides for appeal of the Police Department's decision, Plaintiffs chose not to avail themselves of this option.

4

opposed to the Coalition, as required by standing policy. Defendants stress that Plaintiffs' Application was denied for public safety reasons without consideration of the message underlying the demonstration.

Although Yates indicated on the Application that no police escort would be necessary, Defendants aptly point out that the Application describes the demonstration as consisting of over 200 participants marching down a heavily-traveled Richmond roadway on a Sunday afternoon between 3:00 and 8:00 p.m. Defendants argue that it is illogical to conclude that such an event could be safely conducted without some police presence to control traffic.[5] At the April 26, 2011 hearing, Major Shamus confirmed this observation and described in detail the potential traffic hazards posed by marching the chosen route without police escort. According to Major Shamus, the procession would pass through some twenty-one intersections.

Defendants further maintain that the denial of a preliminary injunction would not result in irreparable harm to Plaintiffs. Defendants add that there are a host of alternative venues or routes available for the demonstration that would not involve costly traffic control, but according to Defendants, Plaintiffs explored none.

To prevail on their petition for preliminary injunctive relief, Plaintiffs must establish: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res.*

---

[5] As noted by counsel for Defendants during oral argument, Virginia law prohibits pedestrians from using the center of the roadway for travel with certain exceptions not relevant here. Va. Code Ann. § 46.2-928.

5

*Def. Council, Inc.*, 555 U.S. 7, ___, 129 S. Ct. 365, 374 (2008). "A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *The Real Truth About Obama, Inc. v. Fed. Elec. Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009). "Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear showing' that, among other things, it is likely to succeed on the merits at trial." *Id.* (quoting *Winter*, 555 U.S. at ___, 129 S. Ct. at 376). Speaking for the Court in *Winter*, Chief Justice Roberts emphasized that "in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at ___, 129 S. Ct. at 376–77 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798, 1803 (1982)).

In essence, this controversy distills to the question of whether the pertinent City ordinance and associated implementing policies trespass on Plaintiffs' First Amendment right of speech and assembly. More specifically, the dispute focuses on whether the City's criteria for assessing reimbursement for assistance by police personnel is so undefined and arbitrary as to invite suppression of disfavored expression, particularly with respect to a waiver of such fees.[6]

---

[6] Plaintiffs also challenge the authority of the Police Department to condition the issuance of a parade permit absent specifically-codified power to do so. Plaintiffs, however, have advanced no persuasive authority to support their position, and this Court is aware of no such constitutional or statutory restriction.

Courts reviewing similar claims have adopted a two-track analytical framework. The standard of measure utilized by courts depends on whether the decision to assess fees for police assistance, and the amount of such fees, was driven to any significant extent by the intended message of the applicant, or the theme of the demonstration. *See Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 354–55 (5th Cir. 2010). In other words, was the application process content-based.

The Supreme Court has long recognized that when groups hold events on public property, municipalities may impose fees as part of a permit scheme controlling such activity. *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S. Ct. 762, 766 (1941). "Permit schemes that allow licensors to censor speech on the basis of its content are prior restraints on speech, against which there is a heavy presumption of invalidity." *Int'l Women's Day March Planning Comm.*, 619 F.3d at 354. Consequently, a permit scheme with restrictions "based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, and restrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, ___, 129 S. Ct. 1125, 1132 (2009). Permit schemes which vest government officials with unbridled and unguided discretion in assessing fees are constitutionally offensive because "government regulation that allows arbitrary application . . . 'has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth Co., Ga. v. Nationalist Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395, 2401 (1992) (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S. Ct. 2559, 2565 (1981)).

On the other hand, a permit scheme which merely controls the time, place, and manner of speech is permissible as long as it is not "based on the content of the message," is "narrowly tailored to serve a significant governmental interest," and "leave[s] open ample alternatives for communication." *Id.* In determining content-neutrality, the principle inquiry for the Court "in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Int'l Women's Day March Planning Comm.*, 619 F.3d at 361 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989)).

Focusing the lens more closely on the immediate case, Plaintiffs contend that the ordinance is facially unconstitutional because it fails to articulate definite guidelines for waiving traffic control costs.[7] Furthermore, Plaintiffs allege that the City of Richmond in fact exercises viewpoint discrimination in selectively waiving fees for police traffic control assistance. In determining whether such waivers implicate the First Amendment, the U.S. Supreme Court in *Thomas v. Chicago Park District* counseled reviewing courts to focus on whether the pattern of waivers reflects a desire to suppress disfavored viewpoints. "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would . . . be unconstitutional." 534 U.S. 316, 325, 122 S. Ct. 775, 781 (2002). Absent such content discrimination, municipalities are free to exercise their legislative discretion in granting waivers for licensing fees. Decisions based solely on

---

[7] To prevail on a facial challenge, a plaintiff must establish that "no set of circumstances exist under which [the challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987).

8

charitable purposes, or public policy devoid of viewpoint discrimination are regulated at the ballot box by the voters, and not by courts.

The Court will now turn to the facts at hand to determine if preliminary injunctive relief is appropriate in this case. Initially, the Court notes that neither the text of the ordinance at issue nor its implementation in this case reveals any form of censorship by the City. In denying the Application as submitted, the Police Department relied on City Code § 102-504(a)(1). The decision was predicated on a finding that the chosen route would "unreasonably interrupt the safe and orderly movement of vehicular . . . traffic." (Defs.' Mem. L. Opp'n Mot. Prelim. Inj. 2.) This decision was apparently based on information provided by Plaintiffs in the Application, namely, that the procession would proceed from Monroe Park west to Lombardy Street, north to Broad Street, east to Laurel Street, and back to Monroe Park. As more detailedly explained by Major Shamus at the hearing, this route would necessitate crossing more than 20 intersections within the City of Richmond. As the U.S. Court of Appeals for the First Circuit pointed out in *Sullivan v. City of Augusta*,

> [I]t seems reasonable for the City to rely upon the experienced judgment of its Police Department to determine personnel and vehicular needs for traffic control at a particular applicant's parade or march. . . . The police, moreover, know the traffic patterns and problems along the different streets in their particular city and its neighborhoods.

511 F.3d 16, 36 (1st Cir. 2007).

Because neither the permit regime in this case nor the ordinance itself involved consideration of the purpose of the demonstration, there is no prior restraint triggering

9

strict scrutiny review.[8] This Court will therefore treat the ordinance as a time, place, and manner licensing system, warranting so-called intermediate scrutiny. Intermediate scrutiny requires narrow tailoring of regulation to serve a legitimate, content-neutral governmental interest, but the tailoring need not be the least restrictive nor the least intrusive possible. *Sullivan v. City of Augusta*, 511 F.3d at 38; *Ward*, 491 U.S. at 798, 109 S. Ct. at 2757–58. "Time, place, and manner restrictions 'are constitutional, if they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information.'" *MacDonald v. City of Chi.*, 243 F.3d 1021, 1032 (7th Cir. 2001) (quoting *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999)).

Richmond City Code § 102-504(a), entitled "Issuance or denial of permit," delineates specific evaluative criteria to be used by the Police Department in determining whether the proposed public assembly has the potential of endangering public health, safety, or welfare. The discretion vested in the Police Department in applying these guidelines is not overly broad and appears to be narrowly tailored to serve the significant governmental interests of ensuring the orderly flow of traffic, protecting the parade participants, and providing for the public safety. Determining whether or not a demonstration or parade would unreasonably interrupt the safe and orderly movement of

---

[8] Section 102-504(e) of the ordinance specifically prohibits content-based decisions on permit applications. "Nothing in this article shall permit the chief of police, or his designee, to deny a permit based upon political, social or religious grounds or reasons based upon the content of the views expressed. Denial of a permit on such grounds is prohibited." (Defs.' Mem. L. Opp'n Mot. Prelim. Inj. Ex. E, at 3.)

10

vehicular traffic does not lend itself to a formulaic mathematical analysis. As the court observed in *MacDonald*, "[w]hile these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." 243 F.3d at 1028 (quoting *Ward*, 491 U.S. at 794, 109 S. Ct. at 2755).

Courts have applied the same rationale in evaluating the number of personnel and resources required to control traffic and pedestrians in the area of the requested procession. *See, e.g., Int'l Women's Day March Planning Comm.*, 619 F.3d at 365–67. In this case, Major Shamus testified that the Police Department had specific general orders governing the number of officers and vehicles required for events based on the number of estimated participants. The Major also testified that the Police Department had a published fee schedule for off-duty officers controlling traffic at demonstrations. This evidence was neither rebutted nor the subject of cross-examination. With respect to this element of Plaintiffs' claim, the Court must conclude that Plaintiffs have failed to clearly demonstrate a reasonable likelihood of prevailing on the merits.

Plaintiffs' contention that the ordinance impermissibly vests discretion in public officials to waive traffic control fees without providing standards to guide the exercise of that discretion is similarly flawed.[9] The ordinance under review contains no specific reference to traffic control fees. Plaintiffs' Application, as submitted, was denied

---

[9] Major Shamus testified that traffic control fees are only waived by the Police Department for government-sponsored events. The Mayor's Office has the authority to dispense with such fees, but no such request was made in this case, and the Mayor is not a party to this suit.

11

because the route selected interfered with the flow of traffic and imposed a safety hazard. The need for traffic control in this instance appears compelling.

The Police Department suggested the hiring of off-duty officers to control traffic on these heavily-traveled thoroughfares to facilitate movement and alleviate the impediment to issuing the permit. This option was an alternative to holding the demonstration at a different site. Although Plaintiffs correctly point out that Defendants did not suggest alternative sites, Plaintiffs on their part made no effort to suggest one. The decision to issue the permit was separate and distinct from the estimated cost of the off-duty police personnel. For the reasons discussed above, Plaintiffs have produced no evidence which would raise any inference or suggestion that the fee schedule is constitutionally suspect.

With respect to proof of irreparable harm, Plaintiffs' forecast of proof is equally unconvincing. No apparent reason has been shown why the demonstration must be conducted on a public roadway to effectuate their message. To avoid paying the cost of necessary traffic control, Plaintiffs could have simply selected an alternative venue, a less traveled route, or remained on the public sidewalks.

The final weighted factor in the analytical framework announced by the U.S. Supreme Court in *Winter v. Natural Resources Defense Council, Inc.* is consideration of the public interest. The Court in *Winter* counseled that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." 555 U.S. at ___, 129 S. Ct. at 376–77 (quoting *Romero-Barcelo*, 456 U.S. at 312, 102 S. Ct. at 1803). First Amendment rights must be harmonized with the

12

"existence of an organized society maintaining public order without which liberty itself would be lost." *Cox*, 312 U.S. at 574, 61 S. Ct. at 765. "[R]egulating the use of public streets . . . to promote the public convenience 'cannot be disregarded by the attempted exercise of some civil right which in the other circumstances would be entitled to protection.'" *Sullivan*, 511 F.3d at 32 (citing *Cox*, 312 U.S. at 574, 61 S. Ct. at 765). This is such a case.

Whether examined facially or as applied to this specific permit application, Plaintiffs have failed to *clearly* show a *likelihood* of prevailing on the merits, or that they will suffer irreparable harm if denied the opportunity to hold their event at their demanded time and place. Indeed, Plaintiffs have exhibited minimal interest in discussing alterative venues or routes, instead choosing litigation.[10]

A preliminary review of the underlying ordinance and implementing orders and policies reveals a permitting regimen which is content-neutral and provides well-defined and carefully articulated guidance to the police in all aspects of the decisional process. This includes the deployment and compensation of off-duty officers when necessary and requested.

Aside from somewhat quixotic speculation, Plaintiffs have neither presented nor forecast any evidence that Defendants' decision to deny their demonstration permit was based on anything other than reasonable public policy considerations.

---

[10] Plaintiffs did, however, agree to meet with a magistrate judge to discuss settlement following the hearing on the preliminary injunction.

For the foregoing reasons, Plaintiffs' Petition for Preliminary Injunction will be denied.

An appropriate Order will accompany this Memorandum Opinion.

                                      /s/
                              Henry E. Hudson
                              United States District Judge

Date: April 28, 2011
Richmond, VA