IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KENNETH YATES and RICHMOND MAY )
DAY COALITION/ORGANIZING )
COMMITTEE, )
)
            Plaintiffs, )
)
v. ) Civil Action No. 3:11CV258–HEH
)
BRYAN NORWOOD, in his official capacity )
as Chief, City of Richmond Police )
Department, *et al.*, )
)
            Defendants. )

## MEMORANDUM OPINION
(Cross-Motions for Summary Judgment)

Plaintiffs filed this action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of Defendants' practice of requiring parade permit applicants in the City of Richmond to bear the cost of any special police resources dedicated to their demonstration. The case is presently before the Court on the parties' cross-motions for summary judgment. For the reasons set forth herein, Defendants' motion will be granted, and Plaintiffs' motion will be denied. Accordingly, summary judgment will be entered in Defendants' favor.

### I. BACKGROUND

The individual plaintiff in this case, Kenneth Yates ("Yates"), is a member of the Richmond May Day Coalition/Organizing Committee ("the Coalition" or, collectively with Yates, "Plaintiffs"). The Coalition describes itself as "a loosely organized coalition

of various Richmond-area groups whose purpose is to hold a march of a political, non-commercial nature celebrating workers and their families on May 1 in Richmond, Virginia." (Verified Compl. ¶¶ 4-5.) Defendants are officials of the Richmond City Police Department ("RPD"), responsible for reviewing and processing applications for parade permits. Bryan Norwood is the Chief of Police. Major Michael J. Shamus[1] and Sergeant John Ward are members of the Special Events Division, the branch of the RPD charged with issuing parade permits. Chief Norwood, Major Shamus, and Sergeant Ward (collectively, "Defendants") are sued in their official capacities.

The record in this case contains the following undisputed facts. On March 21, 2011, Plaintiff Yates, acting on behalf of the Coalition, submitted to the Chief of Police a completed "Parade/Public Assembly Permit Application" ("the Application"), a form provided by the RPD.[2] (Yates Aff. ¶ 3; Defs.' Mem. Supp. Ex. B.) The Application proposed a five-hour "[m]arch [f]or [w]orkers [sic] [r]ights, [s]ocial & [e]conomic [j]ustice," to be held at 3:00 p.m. on May 1, 2011. (Defs.' Mem. Supp. Ex. B.) Yates designated the event as a "public assembly" and "demonstration," and estimated that at least 200 marchers would participate. (*Id.*) He also made clear that the rally would occupy specified public streets,[3] and that it would include signs, banners, street puppets, acoustic marching bands, bull horns, and a small public address system. (*Id.*) And

---

[1] Major Shamus was sued in his official capacity as Captain, but was promoted to Major after the commencement of this suit.

[2] Defendants have attached as Exhibit B to their Memorandum in Support a copy of Yates's Application. *See* Defs.' Mem. Supp. Ex. B.

[3] *See id.* (describing the proposed parade route as beginning in Monroe Park, proceeding west on Main Street, north on Lombardy Street, east on Broad Street, south on Laurel Street, and returning to Monroe Park).

2

although the Coalition's proposed parade route crossed more than twenty downtown intersections, Yates indicated that traffic control or police escort assistance would be unnecessary. (*Id.*) The Application form advised that "[i]f Police assistance is necessary and you need to hire Off-Duty Officers, you will need to contact the Off-Duty Coordinator for the Police Department...." (*Id.*)

On April 11, 2011, Yates received a phone message from an RPD officer informing him that the Coalition's permit request was denied. Upon returning the responding officer's phone call, Yates learned that the RPD would grant his permit if the Coalition agreed to hire off-duty officers for its event. (Yates Aff. ¶ 4; Roelke Dep. 8:13-20, Pl.'s Mem. Supp. Ex. B.) The officer advised Yates that the proposed parade would require the presence of two officers and two police vehicles, at an hourly rate of $28.00 and $35.00 respectively. (*Id.*) In response, Yates represented that for financial reasons and as a matter of principle, the Coalition would not pay for police escorts. Accordingly, Yates's Application was denied. Plaintiffs did not avail themselves of the appeal procedure provided by the City's parade ordinance.

On April 20, 2011, Plaintiffs filed suit in this Court. Their Verified Complaint asserts two separate, but related, claims. In Count One, Plaintiffs seek relief under 42 U.S.C. § 1983, contending that Defendants' practice of requiring permit applicants to compensate off-duty police officers to control traffic and provide security during parades violates the First Amendment to the U.S. Constitution on its face.[4] In Count Two,

---

[4] Initially, Plaintiffs challenged the constitutionality of "Defendants' practice of requiring payment for off-duty police based on their sole discretion ... on its face *and as applied* to the

3

Plaintiffs claim that because the City's parade ordinance, Richmond City Code §§ 102-500 *et seq.* ("the Ordinance"), does not expressly authorize the RPD to require reimbursement for the cost of policing public demonstrations, Defendants' policy exceeds the Ordinance's bounds.

On April 28, 2011, after a hearing, this Court issued a Memorandum Opinion denying Plaintiffs' petition for a preliminary injunction, finding that Plaintiffs could not satisfy the four-part standard prescribed in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Specifically, the Court found that Plaintiffs had failed to demonstrate a reasonable likelihood of prevailing on the merits of their claims. Because this case distills to purely a question of law, both parties have now moved for summary judgment. The matter is ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must determine whether, viewing the record as a whole and in the light most favorable to the non-moving party, "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In this case, the parties agree, and the Court finds, that there are no material facts in dispute.

---

plaintiffs." (Verified Compl. at ¶ 23.) However, Plaintiffs withdrew their as-applied claim at oral argument on the present cross-motions. Only their facial challenge remains.

4

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## III. ANALYSIS

It is well settled that a City may "set[] forth regulations and ordinances requiring advance parade permits as a traditional exercise of control by the local government." *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005) (quoting *Reyes v. City of Lynchburg*, 300 F.3d 449, 454 (4th Cir. 2002); *see also Cox v. State of N.H.*, 312 U.S. 569, 574 (1941) ("[R]egulation of the use of the streets for parades and processions is a traditional exercise of control by local government."). Nor is there any question that a City may recoup the extraordinary expenses borne by its police department in the course of facilitating private public assemblies. *See Cox*, 312 U.S. at 576-77. As a restriction on speech, however, a governmental permit scheme "must meet certain constitutional requirements." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

As an initial matter, the permitting regime at issue in this case does not involve content-based discrimination. Richmond City Code § 102-500 *et seq.* "does not authorize a licensor to pass judgment on the content of speech," because "[n]one of the grounds for denying a permit has anything to do with what a speaker might say."[5] *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002). Indeed, the Ordinance is not limited to

---

[5] In fact, the Ordinance explicitly prohibits City officials from denying a permit "based upon political, social or religious grounds or reasons or based upon the content of the views expressed." *Id.* § 102-504(e).

5

"communicative activity as such"—the First Amendment's principal concern—but applies to protests and footraces alike. *Id.* (deeming content neutral an ordinance applicable "to *all* activity conducted in a public park," and noting that "[t]he picknicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded"). Thus, Defendants' permit "scheme ... is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.*

In order to pass constitutional muster, content-neutral time, place, and manner restrictions "may not delegate overly broad licensing discretion" to the issuing entity. *Forsyth Cnty.*, 505 U.S. at 130. Further, the permitting regime "[(1)] must not be based on the content of the message, [(2)] must be narrowly tailored to serve a significant governmental interest, and [(3)] must leave open ample alternatives for communication." *Id.* In this case, Plaintiffs argue that Richmond's parade ordinance and implementing policies lack sufficiently narrow and objective standards to guide Defendants' discretion to condition the issuance of a permit upon the payment of a traffic control fee.[6] Importantly, Plaintiffs' facial challenge requires the Court to consider not only the pertinent code section, but also the City's "authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth Cnty.*, 505 U.S. at 131. Before addressing the merits of Plaintiffs' claims, therefore, a review of Richmond's permitting regime is in order.

---

[6] Plaintiffs do not argue that the City's parade permitting scheme fails to satisfy any other time, place, and manner requirement.

Richmond City Code § 102-502 makes it "unlawful for any person to conduct or participate in a public assembly, demonstration or parade on the public streets" without "a written permit ... issued in accordance with the provisions" of the Ordinance. Richmond City Code [hereinafter "RCC"] § 102-502. The Ordinance defines a "parade" as "any march, procession or motorcade ... within the city that interferes with or has a tendency to interfere with the normal flow or regulation of pedestrian or vehicular traffic." *Id.* at § 102-501. Thus, prior to conducting a parade within the city limits, an entity must submit a written application to the RPD describing the date, size, and nature of the processional.[7] *Id.* § 102-503(a).

Pursuant to § 102-504 of the Ordinance, "[t]he chief of police, or his designee, *shall issue* the permit within five days of receipt of the completed application, and in any event prior to the scheduled parade or public assembly, *if* the proposed parade or public assembly will not endanger the public health, welfare or safety."[8] *Id.* § 102-504

---

[7] Specifically, applicants must indicate (1) the name and contact information of the sponsoring organization; (2) the "type of public assembly, including a description of the activities planned during the event;" (3) the date and duration of the event; (4) the desired parade route; (5) the approximate number of participants; (6) whether the march will occupy all or part of the streets; (7) whether any sound equipment, banners, signs, or "other attention-getting devices" will be used during the event; and (8) any other information that the chief of police "may deem reasonably necessary in order to properly provide for traffic control, street and property maintenance, administrative arrangements, police and fire protection, and for the protection of public health, safety and welfare." RCC § 102-503(a).

[8] Plaintiffs initially claimed that Defendants violated the terms of the Ordinance by failing to communicate to Yates their decision whether to grant the Application within five days of its submission. (Verified Compl. at ¶ 12.) However, because Plaintiffs are now pursuing only a facial challenge, the particular facts of Plaintiffs' case are largely "irrelevant." *Forsyth Cnty.*, 505 U.S. at 133 n.10 ("Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision.").

(emphasis added). To determine whether a proposed event poses an undue risk to the public, RPD officials must "apply[] the following criteria and find[] that:"

> (1) The time, duration, route and size of [the] parade or assembly will not unreasonably interrupt the safe and orderly movement of vehicular or pedestrian traffic or the normal use of public property in a place open to the general public;
>
> (2) The parade or assembly is not of such a nature that it will require diversion of so great a number of police and fire personnel to properly police the line of movement in areas contiguous thereto so as to impair the normal protection of the remainder of the city;
>
> (3) The applicant has, where appropriate, designated monitors sufficient to control the orderly conduct of the parade or assembly in conformity with such permit;
>
> (4) The applicant has, where appropriate, agreed to be responsible for having appropriate traffic control devices installed ... sufficient to control the orderly conduct of the parade or assembly in conformity with such permit;
>
> (5) The conduct of the parade or assembly will not unduly interfere with the proper fire and police protection of, or ambulance service to, the remainder of the city, or unreasonably disrupt other public services and protection normally provided to the city;
>
> (6) The parade or assembly will not interfere with another parade or assembly for which a permit has been granted; and
>
> (7) The parade or assembly proposed will not violate, and will conform with, all applicable state regulations and laws governing the proposed event.

*Id.* § 102-504(a). Section 102-508 allows an aggrieved applicant to appeal the decision of the RPD to the City's "chief administrative officer" or "the circuit court of the City of Richmond." *Id.* §§ 102-508(a)-(b).

In order to control vehicular and pedestrian traffic, it is the established practice of the RPD to require parade sponsors to pay for off-duty police presence at any

8

processional that traverses public thoroughfares.[9] (Maj. Shamus Dep. 21:4-7.) In accordance with state law,[10] Richmond City Code § 2-1116 allows RPD officers to engage in outside employment, and authorizes the Chief of Police "to promulgate additional reasonable rules and regulations applicable to such off-duty employment." RCC § 2-1116. At their respective depositions, both Major Shamus and Sergeant Ward testified that, because Virginia law prohibits individuals from traveling in the center of public roadways, *see* Va. Code § 46.2-928, applicants seeking to march in the city streets are denied permits unless they agree to reimburse the City for the cost of special police staffing at their event.[11] (*Id.* 21:16-22; Sgt. Ward Dep. 10:1-13.)

Although standing policy mandates police accompaniment at all street parades, the RPD decides on a case-by-case basis, pursuant to RPD General Order 4-6, the exact number of officers required to "safely police the event" and "insur[e] a safe and orderly flow of participants and traffic." (Defs.' Mem. Supp. Ex. E, at 16; Monts Aff. ¶ 6.) In making that determination, the RPD's Outside Employment Coordinator considers the size and location of the proposed processional. (Monts Dep. 6:18-21.) If the event is a

---

[9] Indeed, the permit application itself informs parade organizers that *"[i]f Police assistance is necessary and you need to hire Off-Duty Officers,* you will need to contact the Off-Duty Coordinator for the Police Department." (Defs.' Mem. Supp. Ex. B, at 2.)

[10] Virginia Code § 15.2-1712 provides, in pertinent part:
> [A]ny locality may adopt an ordinance which permits law-enforcement officers and deputy sheriffs in such locality to engage in off duty-employment which may occasionally require the use of their police powers in the performance of such employment. Such ordinance may include reasonable rules to apply to such off-duty employment, or it may delegate the promulgation of such reasonable rules to the chief of the respective police departments or the sheriff of the county or city.

[11] Specifically, Major Shamus stated: "If you're going to march in the street, you're going to obstruct traffic, then you're going to have to have a police escort." (Maj. Shamus Dep. 21:4-7.) Traffic control fees may be waived only for government-sponsored affairs.

recurrent one, the Outside Employment Coordinator also takes into account the tendency of the demonstration to become disruptive and violent, based on the City's "[p]ast experience with the event."[12] (Monts Dep. 6:20-25, 7:1-8.)

Finally, General Order 4-6 contains a fixed compensation schedule for special-events personnel, beginning at "approximately one and one half times the base hourly rate for a Police Officer I at pay step #1." (Defs.' Mem. Supp. Ex. E, at 14-15.) Any variation in the scale must be promulgated by the Chief of Police and "posted via Executive Order." (Id. at 14.) Since January 1, 2009, extra-duty officers have been paid at set rates of $28.00, $30.00, or $33.00 per hour, depending on the particular officer's rank. (Defs.' Mem. Supp. Ex. F, at ¶ 3.) The RPD requires all parade organizers to execute an agreement, form PD-119C, which explicitly states the foregoing rates. (Id.)

In sum, the permitting scheme at issue in this case comprises three separate determinations: (1) whether an applicant's proposed event conforms with the public safety parameters set forth in Richmond City Code § 102-504(a); (2) if not, whether the

---

[12] This Court is cognizant that "[l]isteners' reaction to speech is not a content-neutral basis for regulation," as it necessarily requires an evaluation of the content of a permit applicant's message. Forsyth Cnty., 505 U.S. at 134. Therefore, the testimony of Sergeant Coretta M. Monts, RPD's current Outside Employment Coordinator, that she considers an event's "propensity for violence," gives the Court pause—but only briefly. Sergeant Monts clarified that in calculating the requisite number of officers, she does not take into account the *theme* that a march intends to convey—e.g., whether its offensiveness might evoke hostility—but merely whether the same event has, in fact, become violent in the past. She further indicated that her concern was with the conduct of the "*participants* of the event," and not that of bystanders. (Monts Dep. 6:25.) Compare Forsyth Cnty., 505 U.S. at 134 (finding an ordinance unconstitutional because it required the county to examine the content of the demonstrators' message in order to "estimate the response of others to that content, and to judge the number of police necessary to meet that response"). Because the RPD's assessment does not involve any consideration of the content of an applicant's intended expression, it steers clear of any First Amendment infringement.

assistance of traffic control personnel might bring the processional into compliance; and (3) depending on the number of officers (and vehicles) assigned, the fee to be charged. Upon close inspection, the Court finds that the Ordinance and its related implementing policies contain sufficiently specific criteria to cabin the judgment of the RPD in making each of the foregoing determinations. Plaintiffs' claim that the City grants unconstitutionally excessive discretion to the RPD in assessing permit fees is without support in the record.

Plaintiffs argue that the Supreme Court's holding in the seminal case of *Forsyth County* demands a finding in their favor in the dispute at hand. But while the principles of *Forsyth County* surely guide the Court's analysis today, the facts of that case are readily distinguishable, and Plaintiffs' reliance on its conclusions is thus misplaced. In that case, the Supreme Court considered a county ordinance that, on its face and in practice, gave the county's licensing authority unfettered discretion to set the amount of a parade permit fee, or even to waive it entirely. *Forsyth Cnty.*, 505 U.S. at 131-32. That is, the county administrator could freely decide "[w]hether or not, in any given instance, the fee would include any or all of the county's administrative and security expenses." *Id.* at 131. The fee imposed upon an applicant was not tethered to any particular costs borne by the county, nor to any other objective criteria. Rather, "[t]he decision how much to charge for police protection or administrative time—or even whether to charge at all—[was] left to the whim of the administrator," based on "his own judgment of what would be reasonable." *Id.* at 132-33. Finding in neither the ordinance nor in the county's "established practice" any "narrowly drawn, reasonable and definite standards guiding

the hand of the Forsyth County administrator," the Supreme Court held the licensing scheme to contravene the requirements of the First Amendment. *Id.*

In the immediate case, this Court is not faced with an ordinance granting officials "unbridled discretion" to impose or waive fees at will. *Id.* Nor is the Court confronting an ordinance that provides overly vague criteria for assessing fees, "unanchored in determining the scope of fees necessary to reimburse a municipality for its expenses." *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 367 (5th Cir. 2010) (discussing *Transp. Alts., Inc. v. City of New York*, 340 F.3d 72, 75 (2d Cir. 2003)); *see, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149-50 (1969) (striking a parade ordinance requiring the city commission to issue a permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused"). Rather, the permitting regime in this case more closely resembles those which courts have routinely upheld as vesting local authorities with an appropriately constrained measure of discretion. Three such examples are instructive.

In *Int'l Women's Day March Planning Comm.*, the City of San Antonio's permit scheme required demonstrators to reimburse the City for the cost of police resources diverted to their event. Evidence in the record indicated that the police department assessed a "traffic control fee[] based on its calculation of the number of peace officers and traffic control devices *reasonably necessary* to control traffic in the area of the requested procession." 619 F.3d at 368 (emphasis added). In making its calculation, the police department considered several factors, including the size, location, and date and

time of the proposed march. On review, although the City's parade ordinance and related implementing directives did not provide a clear formula to determine the resources necessary for a given procession, the Fifth Circuit upheld the scheme as a sufficiently limited grant of official discretion.

Likewise, the Seventh Circuit in *MacDonald v. City of Chicago*, 243 F.3d 1021 (7th Cir. 2001), held that an ordinance did not give the City of Chicago unconstitutionally unfettered discretion to issue parade permits because it "specifically and narrowly identifie[d] the reasonable and necessary governmental concerns" that would justify the denial of an applicant's request—namely, "traffic flows, traffic hazards, and emergency transportation." *Id.* at 1027. Further, the Court of Appeals noted that the flexibility inherent in the ordinance's standards did not render the permit scheme impermissible, as it sufficiently limited the City's discretion by requiring the Commissioner to grant a permit *unless* the public-safety concerns set out in the ordinance existed. *Id.* at 1028.

And in *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007), the First Circuit considered the constitutionality of a City's practice of imposing on parade sponsors a fee of $100.00 "plus the cost estimated by the City for cleanup and traffic control." *Id.* at 23. The officer responsible for handling permit applications testified that he based his assessment of traffic control needs, and thus his fee calculation, on "the route to be taken, the duration of the route, the estimated number of [participants]," whether marchers intended to occupy the entirety of the roadways, and "whether ... any other events or special circumstances within the City ... could affect traffic." *Id.* Deeming these factors

"sufficiently precise and definite," the Court found the City's policy to be constitutionally sound. *Id.* at 34.

Like the ordinances upheld in *Int'l Women's Day*, *MacDonald*, and *Sullivan*, Richmond City Code § 102-504(a) delineates specific evaluative criteria to be used by the RPD in determining whether a proposed parade has the potential to endanger public health, safety, or welfare. The Ordinance requires RPD officials to evaluate the impact of the march, in light of its anticipated "time, duration, route and size," on the orderly flow of vehicular and pedestrian traffic, as well as its possible interference with the provision of fire, police, ambulance, and other public services. RCC § 102-504(a)(1)-(7). If, after applying the objective criteria set forth in the Ordinance, the RPD concludes that the proposed event can be conducted safely, lawfully, and without unduly burdening city traffic, the Chief of Police "*shall* issue" a permit. *Id.* That is, the RPD may deny a permit only for one or more of the reasons set forth in the Ordinance. *Cf. Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002).

However, even if the RPD denies an application in the first instance, it further considers whether some measure of police assistance might offset the public risk. As the number of officers necessary is determined by reference to the traffic and safety factors outlined in both General Order 4-6 and the Ordinance itself, this secondary evaluation, too, is guided by specific criteria. Finally, the fee schedule published in General Order 4-6 (and contained in form PD119-C) dictates the amount to be paid by an applicant.

The mere fact that Richmond's permit scheme allows officials to exercise *some* modicum of discretion adds little vitality to Plaintiffs' challenge. Although a law

14

regulating expression "must contain narrow, objective, and definitive standards to *guide* the licensing authority," *Forsyth Cnty.*, 505 U.S. at 131 (emphasis added), it need not entirely *deprive* the governmental entity of discretion. In other words, "the Constitution does not demand that policing decisions be made exclusively by reference to the equivalent of actuary tables and abacuses, simply because the cost of police activities are passed on to individuals engaging in expression protected under the First Amendment." *Int'l Women's Day March Planning Comm*, 619 F.3d at 368. To the contrary, decisions concerning the resources required to maintain order and safety under varying circumstances necessarily call for the exercise of discretion based on law enforcement expertise and familiarity with the potential dangers facing a locality.

In this case, as in *Sullivan*, it seems that "the principal area left to police discretion in estimating ... permit costs" consists of "determining the number of extra officers and police vehicles to assign to a particular parade or march for traffic control purposes." 511 F.3d at 36. Consequently, the First Circuit's observations in that case inform the Court's conclusion here. Noting that "[p]arades and marches obviously vary enormously in terms of size, timing, duration and location, resulting often in quite different traffic control needs," the *Sullivan* Court found it "reasonable for the City to rely upon the experienced judgment of its Police Department to determine personnel and police vehicular needs for traffic control at a particular applicant's parade or march." *Id.* So too here.[13]

---

[13] Indeed, it is both sensible and unsurprising, and certainly *not* constitutionally impermissible, that the RPD would require a greater number of traffic-control officers (and thus charge a higher fee) for a 200-person march on heavily-traveled downtown thoroughfares and

Defendants are entitled to charge a reasonable fee in order "to meet the expense incident to ... the maintenance of public order in the matter licensed," and it is not for this Court to "deny[] to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Cox*, 312 U.S. at 577. Based on the record in this case, the Court must conclude that Richmond City Code §§ 102-500 *et seq.* and its accompanying directives afford constitutionally sufficient "narrowly drawn, reasonable and definite standards" so as to restrain the discretion of RPD officials. Accordingly, Plaintiffs cannot prevail.[14]

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment will be denied. Defendants' Motion for Summary Judgment will be granted.

An appropriate Order will accompany this Memorandum Opinion.

                                           /s/
                                       Henry E. Hudson
                                       United States District Judge

Date: Jan. 10, 2012
Richmond, VA

---

crossing more than twenty major intersections than it would require for a similarly-sized event taking place within the confines of a single neighborhood.

[14] Having disposed of Plaintiffs' federal claim, the Court declines to exercise its supplemental jurisdiction over Plaintiffs' state-law claim. *See Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.").